| | AUSA: | Andrew Lievense | Telephone: (313) 226-9665 |
|---|---|---|---|
| AO 91 (Rev. 11/11)  Criminal Complaint | Special Agent: | Robert J. Schmitz,  FBI | Telephone:(313) 402-2511 |

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

United States of America
 v.

## MARISLENE DELVA

Case No.    2:24–mj–30265

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___August 2018 through August 2019___ in the county of _____Wayne_____ in the ___EASTERN___ District of _____MICHIGAN_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b)(2)(A) | Anti-Kickback Statute |
| 18 U.S.C. § 371 | Conspiracy to Violate the Anti-Kickback Statute |

This criminal complaint is based on these facts:

SEE AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent ROBERT J. SCHMITZ, FBI
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: ___July 12, 2024___

_____
*Judge's signature*

City and state:  _Detroit, Michigan_____

Hon. Elizabeth A. Stafford, United States Magistrate Judge
*Printed name and title*

## Affidavit in Support of Complaint

The undersigned, Robert J. Schmitz, being duly sworn, states as follows:

## Introduction and Agent Background

1.     I am a Special Agent of the Federal Bureau of Investigation and have been so employed since January 2016. I am currently assigned to the Health Care Fraud Squad in the Detroit Division of the FBI.

2.     My duties as a Special Agent have included conducting criminal investigations of individuals, organizations, and businesses that have violated federal laws, including but not limited to Title 42 U.S.C. § 1320a-7b(b)(1)(A) (Anti-Kickback Statute), Title 18 U.S.C. § 1347 (Health Care Fraud), and Title 21 U.S.C. § 841(a)(1) (Unlawful Distribution of Controlled Substances) .

3.     This affidavit is made in support of a criminal complaint and arrest warrant charging MARISLENE DELVA with knowingly and willfully engaging in a scheme to solicit and receive kickbacks in connection with a Federal health care program, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A), and engaging in a conspiracy to defraud the United States by soliciting and receiving kickbacks in connection with a Federal health care program, in violation of 18 U.S.C. § 371.

4.     This affidavit is submitted for the limited purpose of securing a criminal complaint and arrest warrant; therefore, this affidavit does not contain every fact that I have learned during the investigation. I have only set forth the facts necessary to establish probable cause to believe that MARISLENE DELVA, a

physician assistant licensed in the State of Michigan, violated the above-identified statutes. The information in this affidavit is based upon my personal knowledge, training, and experience, and the combined knowledge, training, and experience of other law enforcement officers with whom I have worked on this case.

### The Relevant Statute

5.     Title 42 U.S.C. § 1320a-7b(b)(1)(A) prohibits, among others, health care providers, including physician assistants, from soliciting or receiving kickbacks in exchange for the referral of Medicare and other federally-insured beneficiaries for covered services. Specifically, the statute provides, in pertinent part:

a.  Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . shall be guilty of a felony.

6.     Under the federal anti-kickback statute, among other things, it is illegal to knowingly and willfully solicit money or renumeration of any sort from home health care companies in exchange for the referral of a patient for home health care services for which payment may be made under Medicare.

**Defendant and Alma Care Visiting Services**

7.     MARISLENE DELVA (DoB: XX/XX/1971) is a resident of Romulus, Michigan. DELVA is a practicing Physician's Assistant, licensed in the State of Michigan, and she is the resident agent/owner of Alma Care Visiting Services PLLC ("Alma Care"). Alma Care was incorporated in October 2016 and its original corporate office was listed as DELVA's residence in Romulus. Annual statements filed with the State of Michigan from 2018 – 2023 listed Alma Care's address as XXX06 Morang Avenue, Detroit, MI 48224.

**The Medicare Program**

8.     The Medicare Program ("Medicare") is a federally funded health care program providing benefits to persons who are sixty-five years of age or older or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the Department of Health and Human Services ("HHS"). Individuals who receive Medicare benefits are Medicare "beneficiaries."

9.     Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b). Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).

10.     A Medicare claim is required to set forth, among other things, the beneficiary's name, address, date of birth, social security number, Medicare Beneficiary Identification number, the date the services are provided, the cost of the

3

services provided, and the name and identification number of the physician or other provider who had ordered the services.

11.     Enrolled Medicare providers agree to abide by the policies and procedures, rules, and regulations governing reimbursement, and, furthermore, certify that they will not knowingly present, or cause to be presented, false and fraudulent claims. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies and procedures, rules, and regulations, issued by CMS and its authorized agents and contractors.

12.     Medicare further requires providers to certify that they understand that a payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with these laws, regulations, and program instructions, including the Federal Anti-Kickback Statute. Accordingly, Medicare does not pay claims procured through kickbacks and bribes.

13.     At the relevant times, Part A of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency to beneficiaries who required home health services because of an illness, injury, or medical condition that caused them to be homebound.

14.     To qualify, Medicare required that a physician, or their delegated mid-level provider, i.e. physician assistant or nurse practitioner, certify that a patient

needed home health services and further required that a provider complete a plan of care for the patient. While Part A covered the services provided by the home health agency, Medicare Part B covered the costs of physicians' services, including physician home visits, physician certification and recertification of home health care services, and physician supervision of home health care services. Generally, Medicare Part B covered these costs only if, among other requirements, they were medically necessary, ordered by a physician, and not induced by the payment of remuneration.

15.     Under Medicare Part A and Part B, home health care services were required to be reasonable and medically necessary to the treatment of the patient's illness or injury. Home health care services that were not certified by a physician or were not provided as represented were not reasonable and necessary.

16.     Medicare coverage for home health care services required that certain qualifying conditions be met. In general, a patient is homebound when an illness or injury restricts his ability to leave his place of residence except with the aid of supporting devices or if he has a condition which is such that leaving his home is medically contraindicated.

17.     Medicare typically approves home health care for a 60-day period. The 60-day periods are referred to as episodes. An initial episode of home health care is known as the start of care. Medicare requires that a physician certify that a patient needs home health services and further requires that a physician complete a plan of

care for the patient. After the start of a care cycle, a patient must be recertified by a physician to receive additional 60-day episodes of home health care. The new episodes are known as recertifications.

18.    To receive reimbursement for a covered service from Medicare, a provider must have submitted a claim, either electronically or using a form (*e.g.*, a CMS-1500 form or UB-92), containing the required information appropriately identifying the provider, patient, and services rendered, among other things.

### **Background on DELVA**

**State Licensure and Medicare Enrollment**

19.    According to State of Michigan records, DELVA holds a valid Physician's Assistant license, issued on May 12, 2015.

20.    According to Michigan Compiled Laws § 333.17047, a physician's assistant must practice under the terms of a practice agreement with a participating physician. A valid practice agreement allows the physician assistant to make calls or go on rounds, in addition to allowing the physician's assistant to prescribe a drug, including controlled substances included in schedules 2 to 5. As discussed later in this affidavit, DELVA had a collaboration agreement with a Detroit-area physician, referred to hereafter as DOCTOR-1.

21.    According to CMS's National Provider Plan and Enrollment System, DELVA was issued National Provider Identification ("NPI") number 1144603721

in or around July 2015, and she has utilized this NPI number to submit claims to Medicare for reimbursement since at least January 2018 through present.

22.     DELVA's Medicare provider enrollment, chain, and ownership ("PECOS") indicates that DELVA became enrolled as a Medicare provider on or about August 1, 2015. Medicare records, including enrollment records, indicate that on August 1, 2015, September 21, 2015, September 29, 2015, and February 8, 2017, DELVA certified to Medicare that she would comply with all Medicare rules and regulations, including that she would not knowingly submit, or cause the submission of, a false and fraudulent claim for payment by Medicare and would comply with the federal Anti-Kickback Statute.

**Medicare Claims Data Summary**

23.     Medicare claims data showed that, from approximately January 1, 2018, through present, DELVA billed Medicare Part B for approximately $2.6 million worth of services under her assigned NPI number 114460372. DELVA received Medicare Part B reimbursements of approximately $1.1 million during this same period.

24.     Medicare claims data showed that from approximately January 1, 2018, through present, Detroit-area home health companies received approximately $3.6 million in reimbursements from Medicare Part A for purported home health care episodes that listed DOCTOR-1, DELVA's collaborating physician, as the referring provider. Based on my experience from similar investigations, I am aware that the

referring provider on Medicare home health care claims is typically listed as the overseeing physician, even if the referral was generated from a mid-level provider, such as a physician's assistant or nurse practitioner.

**2018 UPIC Interview of DOCTOR-1**

25.     In October 2018, DOCTOR-1 was interviewed by members of Medicare's Unified Program Integrity Contractors (UPIC). The UPICs are entities contracted by Medicare to fulfill program integrity functions aimed to reduce fraud, waste, and abuse in the Medicare program. DOCTOR-1's interview was conducted pursuant to a UPIC review of a Detroit-area home health care company.

26.     UPIC investigators displayed a list of 36 Medicare patients to DOCTOR-1. The claims data for the 36 Medicare patients listed DOCTOR-1 as the referring provider to a Detroit-area home health care company. DOCTOR-1 did not recognize any of the patients and he stated that none of these 36 Medicare patients were his. DOCTOR-1 then remembered he had a collaboration contract with DELVA. DOCTOR-1 stated that DELVA did not work out of his office and that DOCTOR-1's collaboration with DELVA started at the beginning of 2018. DOCTOR-1 stated that he would meet with DELVA approximately once a month and sign off on the patients for home health only after DELVA had seen the patients and deemed them worthy of home health.

27.     During the interview, DOCTOR-1 placed a call to DELVA. With the UPIC interviewers present, DELVA stated that she would receive patients from a

Detroit-area home health care company and then go out and see the patients to determine if they need home health. DOCTOR-1 asked DELVA over the phone three to four times emphasizing that she was seeing the patients first, to which DELVA stated that she was.

28. At the conclusion of the UPIC's interview of DOCTOR-1, UPIC interviewers presented DOCTOR-1 with an attestation form regarding the 36 Medicare patients referenced above. DOCTOR-1 noted on the attestation form that none of the patients were his and that he had not referred any of these patients for home health care services. DOCTOR-1 also stated on the form *"These are not my patients. These pts are over seen by a PA. That I over see. These pts are seen by her. We meet on a regular basis. Paperwork is signed by me only when the paperwork is completed. The PA makes the assessment & home health plan."*

29. Medicare claims data shows that Medicare Part A paid approximately $430,000 in home health care claims from 2018 to present for services purportedly rendered to the 36 patients noted above. The claims data lists DOCTOR-1 as the referring provider on all these claims.

30. I have reviewed a report of DELVA's controlled substance prescribing from the Michigan Automated Prescription System ("MAPS") which is a database maintained by the Michigan Department of Community Health. MAPS records all controlled substance prescriptions that have been filled at a pharmacy located within the State of Michigan. MAPS data showed that DELVA issued controlled substance

prescriptions, including oxycodone, Norco (hydrocodone), Percocet (oxycodone-acetaminophen), Xanax (alprazolam), and Tylenol #4 (acetaminophen-codeine) on a regular basis to at least 32 of the 36 Medicare patients that DOCTOR-1 did not recognize.

31.    Based on the above Medicare claims data, MAPS prescription data, and the 2018 interview of DOCTOR-1, I believe that DELVA exercises a high degree of autonomy with decisions that she makes regarding Medicare home health care referrals and controlled substance prescribing.

## **Probable Cause that DELVA Solicited Kickbacks and Bribes**

32.    As set forth below, DELVA knowingly and willfully solicited and received kickbacks and bribes in exchange for referring Medicare beneficiaries to a specific Detroit-area home health care agency, in violation of Title 42 U.S.C. § 1320a-7b(b)(2)(A) (Anti-Kickback Statute) and Title 18 U.S.C. § 371 (conspiracy).

33.    I received information concerning the solicitation of health care kickbacks committed by DELVA from an FBI confidential source (hereinafter CS-1). CS-1 has been providing reliable information to the FBI since September 2016. CS-1 has conducted numerous consensually recorded meetings with DELVA during this investigation. CS-1 does not have a criminal history and has never received compensation in return for their information and assistance. The information provided by CS-1 regarding DELVA has been corroborated through consensual recordings. CS-1's information has never been found to be false or misleading. For

these reasons, I consider CS-1 to be reliable. CS-1 has owned a Detroit-area home health care company for over 10 years.

**CS-1 Introduction to DELVA**

34.    In approximately August 2018, CS-1 reported that they had started working with a patient marketer, referred to hereafter as MARKETER-1. The role of patient marketers, also referred to as "patient recruiters," involves marketing the services of a medical business, in this case a home health care agency, to medical providers, i.e. doctors, physician assistants, and nurse practitioners, so that those medical providers may be inclined to refer patients to the medical business. Patient marketers also directly recruit patients and direct them to the business that the marketer is working for.

35.    CS-1 reported that DELVA was the main medical provider that MARKETER-1 was working with at the time. DELVA would see MARKETER-1's recruited Medicare patients, deem them to be homebound, and then send a referral for each Medicare patient to the home health care company designated by MARKETER-1.

**CS-1 Received Information that DELVA wanted Illegal Kickbacks**

36.    In approximately September 2018, CS-1's home health care company began receiving a high volume of home care referrals from DELVA for MARKETER-1's recruited Medicare patients. The home health referral paperwork for each Medicare patient received by CS-1, including the face-to-face encounter

sheets, home health care orders, and plan of care, were signed by both DELVA and DOCTOR-1. All face-to-face encounter sheets from DELVA were on letterhead from her business, Alma Care.

37.    In or around mid-September 2018, CS-1 reported that MARKETER-1 told CS-1, without DELVA present, that DELVA wanted "Something, something." MARKETER-1 told this to CS-1 while making a hand motion and rubbing their fingers together. CS-1 understood that MARKETER-1 was indicating that DELVA wanted to receive compensation in exchange for the Medicare patients that DELVA referred to CS-1's home health care company.

38.    In approximately mid-September 2018, I initiated an investigation and provided CS-1 with a device to consensually record any future in-person meetings with DELVA and MARKETER-1.

**DELVA Overtly Solicited Kickbacks of $250, then $300 Per Patient from CS-1**

39.    On November 6, 2018, CS-1 conducted a consensually recorded meeting (audio only) with DELVA at Alma Care's office. CS-1 reported that during the meeting, DELVA took a sheet of paper, wrote down the number 250, and displayed it to CS-1. CS-1 understood that DELVA was asking CS-1 for $250 for each Medicare patient that DELVA referred to CS-1's company. CS-1's information regarding DELVA's solicitation of $250 per patient is corroborated by the following excerpt from the recording:

CS-1 –          Now you had mentioned something to [MARKETER-1]. I don't, I'd rather have you just tell me instead of referring to [MARKETER-1], like what is it that you…

DELVA –       Because when I go over there

CS-1 –          Uh huh

DELVA –       [Unintelligible]

CS-1 –          Right, I mean, how can, how can I help you? How can [CS-1's home health care company] and you work together?

DELVA –       She tell me, she was going to give me about (unintelligible) (pause) when I give the order she was going to give me this

CS-1 –          Per patient?

DELVA –       Uh huh

                    [Later in the recording]

CS-1 –          So two-fifty a patient?

DELVA –       When I give the orders

CS-1 –          Yeah

40.    Based on my review of the November 6, 2018, recording, I believe that DELVA was soliciting CS-1 to pay $250 for each Medicare patient that DELVA would refer to CS-1's home health care company. I believe DELVA's statement of "When I give the orders" means that DELVA is expecting her $250 kickback for each patient after she sends the home care orders to CS-1's home health care company. Based on my review of the recording, I believe that DELVA is being cautious and taking steps to conceal her solicitation of kickbacks by writing the $250 kickback amount down on a piece of paper rather than overtly stating that she wanted

13

$250 per patient, though she agreed to the amount in response to CS-1 confirming that DELVA wanted "two-fifty a patient."

41.    On December 13, 2018, CS-1 conducted a consensually recorded meeting (audio and video) with DELVA in CS-1's vehicle parked at a location in Oak Park, MI. CS-1 reported that during this meeting, DELVA and CS-1 discussed DELVA's Medicare patients located in Battle Creek. CS-1 wrote down the number 250 on a piece of paper and asked DELVA if that was the price that DELVA would still be willing to accept per patient. DELVA then wrote down on a piece of paper in her own notebook the number 300 and drew a box around that number. CS-1 reported that DELVA increased her price per patient because she needed more money to purchase office equipment. CS-1 also reported that DELVA wrote down "No check." CS-1's information regarding DELVA's increased ask of $300 per patient, up from $250 per patient, is corroborated by the following excerpt from the recording:

CS-1 –      Okay

DELVA –      Okay I will send you some people right now (unintelligible)

CS-1 –      Alright and um, we're, we're, we're doing, what was the. Uh huh

DELVA –      Okay I will send those…

CS-1 –      Okay here, can I tell you, just want to make sure (Audible sound of writing on paper).

[DELVA looks at CS-1 then looks down.]

DELVA –      Oh, okay

14

CS-1 –        What was it?

DELVA –      [Unintelligible]

CS-1 –        You can write it on your stuff. You don't have to write it there.

              [Pause in conversation. DELVA looking down at paper with pen in her hand.]

DELVA –      Okay, I'll give you this so far.

CS-1 –        Mmhmm

DELVA –      [Seen on the recording writing with pen on paper.] Can you do this?

CS-1 –        Okay, okay. It was, wasn't it?

DELVA –      I think it was, I think I talked to you about this.

              [DELVA seen on the recording writing with pen on paper.]

CS-1 –        Yeah

DELVA –      But I don't know, I just.

CS-1 –        You want to make it that now?

DELVA –      No, I make it that because I'm going to buy, I have to buy some office, I'm going to buy some office supply to put in over there.

CS-1 –        Okay.

DELVA –      Because I don't have a desk over there. I'm going to put a desk and chair over there. Okay?

CS-1 –        Okay.

DELVA –      And.

              [DELVA is seen on the recording picking up her notebook again and writing.]

DELVA –      And no

CS-1 –        No check. Okay. Alright.

15

42.     I believe, based on my review of the December 13, 2018, recording, that DELVA wanted CS-1 to pay her an increased kickback amount of $300 per patient.

**CS-1 pays Kickbacks to Delva in exchange for Medicare Patient Referrals**

43.     Under the direction and supervision of the FBI, CS-1 met with DELVA on multiple dates to record kickback payments. CS-1's kickback payments to DELVA were made in exchange for DELVA's referred Medicare patients that CS-1's home health care company was able to successfully open for new episodes. Leading up to each recording, I met with CS-1 to determine how many of the Medicare patients referred to CS-1's company were actually opened for home health care episodes, and, in turn, how much money CS-1 would owe DELVA.

44.     Based on my training and experience investigating similar cases, I am aware that home health care companies involved in illegal kickback schemes would only pay for patients that were successfully opened for home health episodes. CS-1 reported that many of the Medicare patients referred by DELVA to CS-1's home health care company were only interested in obtaining narcotic prescriptions from DELVA, were non-compliant with home care, and could not be opened for home health episodes. In many cases, DELVA's referred Medicare patients would refuse services or not be home when CS-1's employees attempted to open or visit the patient, and could not be opened for home health episodes. As a result, CS-1 would

not pay DELVA for those patients unable to be opened for home health care episodes.

45. The below table provides a summary of the kickbacks that CS-1 paid to DELVA, which were made during recorded interactions between CS-1 and DELVA.

| DATE | MEETING LOCATION | KICKBACK AMOUNT | NUMBER OF PATIENTS |
|---|---|---|---|
| January 22, 2019 | Detroit, MI | $1,500 | 5 |
| March 5, 2019 | Detroit, MI | $2,400 | 8 |
| July 19, 2019 | Detroit, MI | $3,000 | 10 |
| August 9, 2019 | Detroit, MI | $3,000 | 10 |

46. A more detailed summary is provided below for the two kickback payments that occurred on July 19, 2019, and August 9, 2019.

47. In late June 2019, I met with CS-1 and determined that CS-1 owed DELVA a kickback for 20 Medicare patients who had been opened by CS-1's home health care company for episodes since the last kickback payment on March 5, 2019.

48. On July 19, 2019, Special Agents provided CS-1 with consensual recording devices and $3,000 cash (FBI operational funds). After activating the recording devices, CS-1 drove to meet DELVA in the parking lot of a location in Detroit, MI. DELVA eventually arrived and entered CS-1's vehicle. The following exchange occurred on the recording:

CS- 1 –    Okay so here, I wanted to show you this. These are the um, patients that, they're twenty patients, right?

DELVA –    Mmhmm

17

CS-1 –       So I owe you six-thousand dollars, right? So I have three thousand for you, okay, and then next week or the week after I'll give you the other, other um, three thousand. Okay? Is that okay? Do you want to keep this? Or, yeah.

             [On the video recording, CS-1 is observed passing the list of 20 patients to DELVA.]

CS-1 -       Alright. And here's the money.

             [On the video recording, CS-1 is observed passing the cash to DELVA. DELVA is observed holding her hand out and accepting the cash.]

CS-1 –       Do you want to count it?

DELVA –      (Unintelligible)

CS-1 –       Just make, make sure.

             [On the recording, there is an audible sound of the shuffling of dollar bills. DELVA then answers an incoming call to her cell phone. Later, after DELVA finishes the call, she resumes counting. The following conversation takes place:]

CS-1 –       Brand new notes.

DELVA –      Mmhmm…okay

CS-1 –       Is that good?

DELVA –      Yeah

CS-1 -       Three thousand? And then um, in one or two weeks, I'll get more, okay?

49.    On August 9, 2019, Special Agents provided CS-1 with consensual recording devices and $3,000 cash (FBI operational funds). After activating the recording devices, CS-1 drove to meet DELVA in the parking lot of a location in Detroit, MI. DELVA eventually arrived and entered CS-1's vehicle. The following exchange occurred on the recording:

CS- 1 –     Alright, okay so um last time I gave you for ten patients, right?

DELVA –     Mmhmm

CS-1 –      So here's three thousand for another, for the rest of the ten patients. Do you want to count it? Can you count it, just to make sure?

            [On the video recording, CS-1 is observed passing the cash to DELVA. DELVA is observed holding her hand out and accepting the cash in her hand.]

DELVA –     Hey, there's one more thing.

CS-1 –      Yes.

DELVA –     When you're over the phone don't say I want to sq –

            [DELVA is observed on the video recording laughing and shaking her head.]

DELVA –     What about if somebody is listening to you?

CS-1 –      Somebody's listening?

DELVA –     What if somebody's listening say oh, [unintelligible] and now I'm going to square.

CS-1 –      Okay, alright, I thought that was a, like a code for us to, could be square away with patients' orders or something.

DELVA –     Yeah I know but sometime [unintelligible] yeah okay yeah

CS-1 –      Yeah

DELVA –     Why she saying square, oh my god (laughter)

CS-1 –      No I didn't say, that's why I didn't say money

DELVA –     Mmhmm, mmhmm

CS-1 –      Because that would be like, when I say square away...but yeah I won't

DELVA –     I know if we're meeting I know what we do

CS-1 –      Yeah

DELVA –     Because I don't want to leave any evidence.

19

## **CONCLUSION**

50.    Based on the foregoing, I believe probable cause exists that MARISLENE DELVA violated Title 42 U.S.C. § 1320a-7b(b)(2)(A) (Anti-Kickback Statute) and Title 18 U.S.C. § 371 (conspiracy to violate the Anti-Kickback Statute).

_____
Special Agent Robert J. Schmitz
Federal Bureau of Investigation

Sworn to before me and signed in my presence
And/or by reliable electronic means.

_____
HON. ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated:   July 12, 2024

20